

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 1, 2020

**<u>VIA ECF</u>**

The Honorable Analisa Torres
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

RE:  *United States v. Morris E. Zukerman*, 16 Cr. 194 (AT)

Dear Judge Torres:

The Government respectfully submits this letter in opposition to the motion of defendant Morris E. Zukerman ("Zukerman" or the "defendant"), which seeks release, roughly halfway through the 70-month custodial term imposed by this Court, on the basis of "extraordinary and compelling reasons," namely the recent COVID-19 outbreak (the "Motion"). *See* 18 U.S.C. § 3582(c)(1)(A)(i). Because (1) the defendant, by his own admission, has failed to comply with the statute's mandatory administrative exhaustion requirement, and, in any event, (2) the defendant is not an appropriate candidate for release given the seriousness and duration of his offense, the Motion should be denied.

## <u>Background</u>

As the Court is aware, the defendant pleaded guilty in 2016 to tax evasion, in violation of 26 U.S.C. § 7201, and corruptly obstructing the due administration of the Internal Revenue Service, in violation of 26 U.S.C. § 7212(a). As the Court recognized in its supplemental sentencing opinion, Zukerman's criminal conduct, resulting in over $45 million of tax harm, spanned a 15-year period and included the falsification of over fifty tax returns for ten different individuals and entities. Moreover, this Court recognized that the recidivist nature of Zukerman's conduct – defrauding the State of New York in a sales tax scheme, and then repeating the same conduct years later, in addition to orchestrating a massive fraud on the IRS – warranted a 70-month within-Guidelines sentence, as well as an above-Guidelines $10 million fine. In justifying the fine amount, this Court explained that an upward variance was appropriate in order to afford both specific and general deterrence.

The defendant began serving his 70-month sentence on or about May 20, 2017 and was originally scheduled to be released in July 2022. According to the defendant, due to recent sentencing reform legislation, the defendant is now scheduled to be released in May 2021. (Motion at 1-2). The defendant also notes in the Motion that he may receive significant additional "good time" credits, thereby further reducing the 70-month sentence that this Court deemed appropriate, based on the Court's thorough consideration of the defendant's conduct – which this Court

ultimately characterized as "repeated[]" and "brazen[]" sophisticated tax fraud spanning almost two decades.

In the instant Motion, the defendant contends that the COVID-19 pandemic presents "an 'extraordinary and compelling' circumstance" warranting his immediate release on supervised release with home confinement for the duration of his sentence. (Motion at 1). Specifically, the defendant, who is 75, cites his age and "medical status" as warranting early release. (*Id.*) According to the defendant, on March 27, 2020, the defendant "emailed a request for compassionate release to Otisville's warden." (*Id.* at 4 n. 13 & Ex. C). The BOP has not yet acted on that administrative relief request, which it received just a few days ago. The defendant concedes that he has not exhausted his administrative remedies, as he is required to do by federal statute. (*Id.* at 4 n.13).

## Applicable Law

The district court may modify a term of imprisonment previously imposed if "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). But it may do so only upon a motion of the BOP or upon a motion of the defendant, in the latter case provided that "the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." *Id.* Several court of appeals have held that the requirements of Section 3582(c) constitute a jurisdictional bar preventing a district court from granting relief unless satisfied. *See United States v. Monzon*, 2020 WL 550220, at *2 (S.D.N.Y. Feb. 4, 2020) (collecting cases). And while the Second Circuit has not decided the question, it has made clear that as a general matter courts are "required to strictly enforce statutory exhaustion requirements." *Theodoropoulous v. I.N.S.*, 358 F.3d 162, 172 (2d Cir. 2004). This Court therefore "cannot grant [the] motion for sentence reduction" at this time. *Monzon*, 2020 WL 5500220, at *2; *see also* 18 U.S.C. § 3582(c) (absent exhaustion of administrative remedies, a court "*may not* modify a term of imprisonment") (emphasis added). Consistent with that guidance, courts in the Second Circuit have denied Section 3582(c) claims brought by defendants who have failed to exhaust their administrative rights under the statute. *See, e.g.*, *United States v. Hernandez*, 2020 WL 1445851, at *1 (S.D.N.Y. Mar. 25, 2020) (finding that the compassionate release provisions of the First Step Act did not apply because "Mr. Hernandez does not appear to have sought any [ ] relief within the Bureau of Prisons, let alone exhausted his administrative remedies"); *United States v. Gileno*, 2020 WL 1307108, at *4 (D. Conn. Mar. 19, 2020) (denying motion for modification of sentence based on COVID-19 concerns "without prejudice to renewal" after exhaustion of remedies); see also *United States v. Shah*, 10 Cr. 70 (CJC), Dkt. 329 (C.D. Cal. Mar. 30, 2020) (denying defendant's motion for early release due to COVID-19 where defendant failed to exhaust administrative remedies).

## Discussion

The defendant's motion fails for two independent reasons. First, the defendant has failed to comply with the statute's mandatory exhaustion requirement. Second, the defendant is not an

appropriate candidate for release in light of the extraordinary seriousness and pervasiveness of the fraud scheme of which he was convicted.

### A.  The Defendant Has Failed to Comply With the Statutory Exhaustion Requirement

As an initial matter, defendant cites no authority permitting waiver of the exhaustion requirement under Section 3582(c).  Instead, he argues that "[u]nder these exigent circumstances . . . requiring the 30-day period to pass before Mr. Zukerman could seek relief from the court would be futile and only further endanger Mr. Zukerman's health."  (Motion at 4. n. 13).  But the defendant offers no reason why this would be so and, in any event, his argument is contrary to law. 18 U.S.C. § 3582(c)(1)(A)(i).

Even assuming the Court had discretion to waive the statutory exhaustion requirement (and it does not, for the reasons stated above), there are nonetheless sound reasons to require the defendant to nonetheless comply with that requirement and pursue a BOP review of his case, particularly whereas here the defendant seeks to rely on factual claims about his health and conditions of confinement as to which there is presently no fully developed record.   Indeed, the BOP is uniquely positioned to assess and provide the Court with detailed information about the defendant's present health condition, his behavior since being incarcerated, his recidivism score, the conditions of confinement at Otisville, and the relative merits of the defendant's claim as opposed to the many others being made by similarly situated defendants at Otisville and across the country.   Moreover, to the extent the defendant seeks to rely on recent guidance promulgated by the Attorney General – guidance that does not, on its face, even appear to apply to this defendant or a motion made under Section 3582 – that guidance was in any event provided to the BOP for the BOP's use in conducting the very sort of administrative review the defendant now seeks to circumvent.

To be sure, the COVID-19 pandemic warrants serious attention.  But the defendant has offered no evidence to suggest the BOP is not taking the pandemic seriously or will not meaningfully consider his administrative request.  To the contrary, the BOP has made significant efforts to respond.  In particular, since at least October 2012, BOP has had a Pandemic Influenza Plan in place.  *See* BOP Health Management Resources, available at https://www.bop.gov/resources/health_care_mngmt.jsp.  Moreover, beginning approximately two months ago, in January 2020, BOP began to plan specifically for coronavirus/COVID-19 to ensure the health and safety of inmates and BOP personnel.  *See* Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid- 19.jsp.  As part of its Phase One response to coronavirus/COVID-19, BOP began to study "where the infection was occurring and best practices to mitigate transmission." *Id.*  In addition, BOP set up "an agency task force" to study and coordinate its response to coronavirus/COVID-19, including using "subject-matter experts both internal and external to the agency including guidance and directives from the [World Health Organization (WHO)], the [Centers for Disease Control and Prevention (CDC)], the Office of Personnel Management (OPM), the Department of Justice (DOJ) and the Office of the Vice President. BOP's planning is structured using the Incident Command System (ICS) framework." *Id.*

On April 1, 2020, the BOP, after coordination with DOJ and the White House, implemented its Phase Five response in order to mitigate the spread of COVID-19. https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp. As part of the Phase Five response, the BOP (a) will secure inmates in their assigned quarters for a 14-day period to decrease the spread of the virus, (b) continue to provide inmates access to programs and services that are offered under normal operating procedures, to the extent practicable, and (c) coordinate with the U.S. Marshals Service to reduce the movement of incoming inmates. The BOP will reevaluate Phase 5 after the 14-day period ends. *Id.* These steps belie any suggestion that BOP is failing to meaningfully address the risks posed by COVID-19 or take seriously the threat the pandemic poses to current inmates. The defendant, moreover, has not demonstrated that there is a crisis at Otisville such that his own health is at immediate risk. *See, e.g., Gileno*, 2020 WL 1307108, at *4 ("With regard to the COVID-19 pandemic, Mr. Gileno has also not shown that the plan proposed by the Bureau of Prisons is inadequate to manage the pandemic within Mr. Gileno's correctional facility, or that the facility is specifically unable to adequately treat Mr. Gileno."). Accordingly, the circumstances presented by the defendant do not warrant the relief he seeks.

Although this Court recently granted a motion for compassionate release in *United States v. Perez*, 17 Cr. 513 (AT) (Dkt. 98) (Apr. 1, 2020), that case is easily distinguishable. In *Perez*, the defendant, a prisoner at the Metropolitan Detention Center, was serving a three-year sentence for kidnapping and conspiracy that was scheduled to end on April 17, 2020. The defendant presented unusual factors that weighed in favor of his release, including that (1) the defendant was at risk of experiencing serious complications from COVID-19 due to medical complications arising from "two vicious beatings" while he was incarcerated, (2) his three-year sentence was scheduled to end within days, and (3) the Government did not object on the merits to the defendant's release. The Court observed, against the backdrop of those unique circumstances, that "even a few weeks' delay carries the risk of catastrophic health consequences for [the defendant]," and "requiring him to exhaust administrative remedies, given his unique circumstances and the exigency of a rapidly advancing pandemic, would result in undue prejudice and render exhaustion of the full BOP administrative process both futile and inadequate." *Id.* at 4-5.

The facts presented by Zukerman are entirely different. First, Zukerman has completed only approximately half of the 70-month term of imprisonment imposed by the Court. Even if he receives the benefit of recent sentencing reform legislation, he still would not be released for more than another year, until May 2021. Accordingly, this is not a case in which "exhaustion of the full BOP administrative process" would be "both futile and inadequate." *Id.* Second, unlike in *Perez*, there are not extraordinary and compelling reasons for release because Zukerman has not demonstrated that there is a crisis at Otisville such that his health is at immediate risk. In fact, the health issues identified by Zukerman were present, fully known, and considered by the Court when he was sentenced in May 2017. Third, as set forth below, Zukerman is not a compelling candidate for release given his extraordinarily serious offense and the need for deterrence, as the Court addressed at sentencing.

## B.  The Defendant Is Not an Appropriate Candidate for Release

Zukerman, moreover, is not an appropriate candidate for release in light of the seriousness and duration of is criminal conduct. As the Court observed in connection with sentencing, the

defendant, a Harvard-educated businessman, perpetrated a brazen, sophisticated, multi-year fraud scheme in order to evade approximately $45 million in taxes.  His conduct included, among other things, evading taxes on the purchase of art, lying to the IRS during two different audits, diverting funds from corporate entities that he controlled to pay the salary of a domestic employee, evading personal income tax by disguising payments for real estate in Maine as contributions to a purported charitable land trust, concealing income from various corporations he controlled, evading sales tax on a $645,000 pair of diamond earrings, and causing family members and household employees to file false tax returns.  Most significantly, the defendant also orchestrated a multi-year scheme involving the falsification of corporate documents and lies to his tax advisors to evade taxes owed from his company's sale of an interest in an oil company.  The defendant engaged in all of this conduct *after* he had successfully avoided criminal prosecution by New York State tax authorities for engaging in similar sales tax evasion years earlier.  The defendant, of course, perpetrated these tax fraud schemes despite his education, social status, and the extraordinary wealth he enjoyed as a sophisticated Manhattan businessman.

After considering these facts at sentencing, the Court observed: "Mr. Zukerman evaded taxes totaling millions of dollars. He was driven not by need, but by unmitigated greed.  He entangled himself in a web of lies and deceit, lying to his tax preparer, and then hiring lawyers to defend his lies.  He went to such extraordinary lengths in order to cheat.  These frauds were deliberate and calculated.  Mr. Zukerman thought himself to be above the law." (Sentencing Tr., Mar. 21, 2017, at 37).

## C.  Conclusion

Because the defendant has failed to comply with the statute's mandatory requirement that he first make his application to the BOP and permit the BOP to review and act upon that application, the instant Motion should be denied.  Even assuming the Court had jurisdiction to evaluate the merits of the defendant's Section 3582(c) claim at this time, the defendant has failed to demonstrate "extraordinary" circumstances that would warrant his current release.  The defendant is not an appropriate candidate for release in light of the seriousness and pervasiveness of his offense.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____s/_____

Edward A. Imperatore
Assistant United States Attorney
(212) 637-2294
Stanley J. Okula, Jr.
Special Assistant U.S. Attorney
(202) 514-2839

cc:     Defense counsel (by ECF)